IN THE MATTER OF THE ESTATE OF JOSEPH ROSS, DE-
CEASED.

[Decided May 6, 1901.]

Wills—Pretermitted Child.—Where a Man Makes a Bequest to his
son who, unknown to the testator, is at the time dead, for which rea-
son the legacy lapses, the child of the son is entitled to the same
share of the estate as if the testator had died intestate.

Decree of Distribution—Right of Omitted Child to Relief.—The su-
perior court in probate has jurisdiction to open a decree of distribu-
tion in behalf of a minor child whom the decedent omitted from his
will and for whom the decree makes no provision; and want of dili-
gence, in ascertaining his rights, will not be imputed to the child, if he
is of tender years.

Death—Presumption of from Absence.—The Presumption of Law
is, that a person absent and unheard of for seven years is dead.

Joseph Ross died October 27, 1898, leaving a will which was admitted to probate. The provision of the will involved in the present decision will be found in the first paragraph of the opinion of the court.

COFFEY, J. "Thirdly, I give and bequeath to my two sons, Joseph L. Ross and John M. Ross, the sum of ten dollars each, and no other part or portion of my estate."

He specifically devised a house and lot to a stepdaughter, Harriet C. Babson, and the remainder of his estate to his two daughters, Mrs. Hallet and Mrs. Frear, making the latter, together with the husband of the former, his executors. Hallet subsequently pending administration died, leaving Mrs. Frear sole executrix.

Testator was a widower aged about seventy-six years when he died. On October 7, 1899, the executrix filed her petition for distribution of the estate, according to the terms of the testament, alleging performance of her duties, and reciting that decedent left him surviving two daughters, namely, Mrs. Mary E. Hallet and Mrs. Meda F. Frear, both over the age of twenty-one years and residents of San Francisco, and "that Joseph L. Ross and John M. Ross, the two sons of decedent named in his will, have not been heard of for more than ten (10) years last past, and are believed to be dead." In her final report as executrix she states that "by the will of decedent ten dollars is bequeathed to each of the two sons of decedent, namely, Joseph L. and John M. Ross. John M. Ross went to sea over twenty years ago and has not been heard from since, and has long been believed to be dead by his family. Joseph L. Ross left California over ten years ago and has never been back since, and though diligent efforts have been made, especially since the death of decedent, to ascertain his whereabouts, no trace of him has been discovered, and he is believed to be dead."

This report was subscribed and sworn to by Meda F. Frear, executrix, on the seventh day of October, 1899. On the twentieth day of October, 1899, pursuant to petition, a decree of distribution was made, entered and filed, according to the terms of the will. On the 16th of December, 1899, a

letter was addressed to the judge presiding in this department reading as follows:

"December 16, 1899.

"Dear Sir: From investigations made, I am convinced that my daughter, Ethel Ross, the child of myself and my former husband, Joseph L. Ross, is entitled to a share, of the estate of Joseph Ross, deceased; the administration of this estate was, and is, pending in your Court, and I think the interests of the child should be protected through the appointment of an attorney to represent her. As the child's mother and natural guardian, I would request that you would appoint Mr. I. I. Brown, as such attorney.

"Very respectfully,

"Mrs. SOPHIE JENSEN."

In compliance with this request the court made the appointment of the attorney on the same day, the letter and order being filed on the 20th of December, 1899, and on this latter named date the attorney so appointed filed the petition of Ethel Ross, the minor mentioned, wherein it was recited that she was twelve years of age and the only child of said Joseph L. Ross, who died outside of the state of California during the year 1890. Other facts are recited to show her right to relief by setting aside the decree of distribution entered on October 20, 1899.

Simultaneously was filed the petition of the said minor claiming to be pretermitted heir of Joseph Ross, the testator, as sole issue of his son, Joseph L. Ross, deceased, at the time of the execution of the will, and averring that the omission of the testator to provide for her was not intentional, and that she is thereby entitled as an heir to a one-third interest in the estate and praying for a distribution to her of such share. Objections and answers were made to these petitions by the executrix and by Mrs. Babson, a devisee, and in due course, after full consideration of the affidavits of parties and the arguments of counsel, the judgment and decree of distribution were set aside and the matter reopened on the petition by the minor.

The cause came on regularly for trial and much evidence was elicited, from which it was sought to show on the one side that Joseph L. Ross, the son of testator and father of claim-

ant, was not in existence at the time of the making of the will; that the provision in that instrument for the son was not a provision for his daughter Ethel, such as is contemplated by section 1307 of the Civil Code of California; that she is not provided for under the law by reason of section 1310 of the same code; and that the legacy to Joseph L. Ross was void and did not pass to Ethel.

On the other side, it is contended that there are two propositions necessary to the success of petitioner: 1. Establishment by claimant of presumption of death of Joseph L. Ross; 2. If that be established, the law of pretermission as affecting the claim of minor as successor of her father.

As to the first proposition, the position of respondents is, that the death of Joseph L. Ross has not been established by presumption of law or otherwise.

The testimony of Mrs. Meda F. Frear is that her father told her about the time of the execution of the will that he had heard that his son, Joseph L. Ross, was living in La Grange, Illinois, with his brother's widow, whom he had married and who was supporting him; that when she made the statement in her report as executrix she meant only that from the search she had made through her attorney since the death of her father she could not find her brother and believed him to be dead; that afterward again she searched for information and learned that one Mrs. George Walker, who had relatives in La Grange, Illinois, had received tidings of Joseph L. Ross and in that connection the executrix received a letter as follows:

"San Francisco, Jan. 2, 1899.

"Dear Meda: You asked me to let you know by mail if we should hear about Joe. Mrs. Walker called to-day, with a letter she had just received from her people, saying that after many inquiries, they found that Joe was living in Chicago, and that his address was Adams Street, near Holsted, Chicago. She also said that they had sent him word of his father's death; and had given him your address. Uncle John was here when Mrs. Walker called, and heard all that was said.

"With love,

"Aunt LILLIE."

Mrs. Mary Walker testified that she was acquainted with the family of Joseph Ross, deceased; that she had in the month of December, 1898, two cousins residing in La Grange, Illinois; that after the death of Joseph Ross she wrote to her cousin, Nellie Dickson, then residing there, and received from her on or about January 2, 1899, a letter stating that Joseph L. Ross was then living there in La Grange; that afterward she wrote again to her said cousin, Nellie Dickson, and was informed that said Joseph L. Ross had left La Grange and had gone to Chicago to live.

Mrs. Mary E. Hallet deposed that she frequently heard her father, Joseph Ross, state that her brother, Joseph L., was residing in Illinois, and a short time before her father died she heard him say that Joseph L. was living in Chicago, and that he was married again, and that he had no doubt that Joseph L. would return as soon as he was dead and make them trouble about the will.

Thomas R. Henshelwood was intimately acquainted with Joseph Ross, Sr., for more than forty years prior to his death; boarded on two occasions with his family and was intimate with all of them; two or three years before the death of the father in a conversation with Henshelwood about the Ross family matters he asked him if he ever heard from his son, Joseph L., and the answer was, ''Yes, he is married to Willie's widow and is now living in Chicago.''

The presumption of law is, that a person not heard from in seven years is dead. The burden being originally cast upon the claimant, she relied principally upon her mother's evidence, which was to the effect that Joseph L. Ross was last heard from in Spokane, Washington, in 1889. In that year she received the last letter from him, dated July 24, 1889; this was the last communication direct from him and was tender in tone and tenor, couched in terms of affection, engaging to write again, treating of his illness and the malarious condition of the locality in which he was sojourning; all of the letters exhibiting solicitude for her and for her child, and tending to prove that if he lived he would write to her.

Prior to this letter of July 24, 1889, Joseph L. Ross was a constant correspondent, having written during a period of less than eight months at least a dozen letters to his wife,

all in the same strain of endearment as the last. No reason consistent with his continued existence 'is in evidence to account for the cessation of his correspondence. The statement of Newbery sustains the theory of presumption:

"N. Y., Jany. 8, '01.

"Gavin McNab, San Francisco.

"Dear Sir: Your letter of December 15th was received during my absence from the city.

"I have not seen Joseph L. Ross since 1889, and know nothing about his whereabouts. He came to me at Spokane in 1888, I think it was, with all the outward evidence of being a tramp. I fed and clothed him, obtained employment for him and tried to redeem him. It was useless, however. Before very long he went back to his evil ways and I refused to have anything to do with him further. I have no doubt he is dead, but that is merely an opinion. Sometimes such wretched creatures last longer than they ought to.

"Yours, etc.,

"A. A. NEWBERY."

It appears from this correspondence that the relations between Joseph L. Ross and his wife were friendly, and that he was concerned for the welfare of his child and desired to be with his family, his last letter ending in these words at the end of five pages of recital of hardships experienced by him in the northern territory:

"So, my dearest Soph, your only resource for the immediate present is to call on my father, and you must certainly do this at all hazards. I will and shall make a place for you and myself in this world and that as soon as I can get out out of here. Where I shall go I will let you know as soon as I decide, but of this rest assured, I in my next start will make a place for our baby and ourselves. You cannot think how tenderly I have cherished the lock of hair you sent me of sweet Ethel, nor can you think how much I long for you both, nor how much your sufferings have worried and driven me almost to desperation.

"Dearest Soph, I must now say good-bye, but not for long as I trust and firmly believe we will ere long be happily united, never again to be separated. Let me urge you to share in this my belief; and may God's help be with you to

enable you to do so. With my deepest love and affection for yourself and baby.             Yours ever,

                                        "JOE."

"P. S.—I will surely write you where I am and my prospects."

He never wrote again, and his wife having made unavailing search and inquiry for him for years concluded her mourning by marrying a second time; she believed him dead in 1891; she sought information about him in 1892 and could hear nothing of him; but, notwithstanding her belief that he was no longer living, she was induced to institute a suit for divorce, having been persuaded that it was best for her to make assurance doubly sure by a judicial decree of dissolution, and in order to obtain jurisdiction she made an affidavit for publication of summons in which she recited that she had made diligent inquiry and had heard that he was living in New York. In her testimony she undertakes to explain this statement by saying that it was made upon information received through her attorney, upon which she relied.

It is contended that this affidavit estops her from now denying its contents, and that, moreover, after the divorce secured in 1892 she was a stranger to him and there was no reason why she should have heard from him; and besides her complaint in divorce alleged desertion in 1888, and when she made the affidavit in 1891, and when it was her interest to so state, she alleged his existence and whereabouts. But the affidavit alluded to is not conclusive evidence against her; it is not an estoppel, as our appellate court has declared. When she went upon the stand as a witness in this proceeding in behalf of her child she explained that she made the statement therein upon the strength of a rumor she had heard through her attorney, which rumor turned out to be false. This court can well find so far as that affidavit is concerned, in view of her testimony herein, that there was no authentic information that her husband, Joseph L. Ross, was alive at that time. Convinced of his death she subsequently married and became Mrs. Jensen.

When claimant established the fact that Joseph L. Ross was last heard from in 1889 in Spokane, through the testimony of

her mother and the letters received by her and the statement admitted as coming from Newbery, she did all that was required by the law of presumptions to make out her case in chief. The burden of proof then shifted to respondents, and they rely mainly upon the belief imputed to the testator from his statements that he had heard that his son, Joseph L., was living in Illinois with his brother's widow. Notwithstanding her statement made in the report verified by her as executrix that she had after diligent efforts made, especially after the death of testator, to ascertain the whereabouts of Joseph discovered no trace of him, and believed him to be dead, she now asserts the contrary on the strength of rumors which, when ciphered down to final demonstration, show that a man supposed by some persons to be Joseph L. Ross was living for a time in La Grange, Illinois, with the widow of William Ross, and that the correspondence introduced in the testimony of Mrs. Freer and Mrs. Walker referred to this individual and the statements attributed to testator pointed to the same person, but there is no proof of the identity of the missing son with this man other than that he was sometimes called by the same name, Ross, or Joseph Ross, or "Joe L." Ross. The husband of executrix made a journey pending this proceeding to Illinois, but failed to find any satisfactory evidence of identity; at least no testimony came from him throwing light on the subject; and, finally, there came upon the stand a witness answering here to the name of John Watson, of whom it is said that his testimony, fortified by certain voluminous reports from detectives, furnishes the last link in the chain of evidence that he was the man mistaken for Joseph L. Ross in La Grange.

Counsel for respondents comments on what he denominates the peculiar character of the testimony of John Watson in connection with the reports of the operations of Pinkerton's National Detective Agency, called for convenience the "Pinkerton letters," written to attorneys for claimant, for the purpose of verifying or falsifying the report that Joseph L. Ross had ever lived at La Grange, Illinois, and counsel claimed as the result of an analysis of those letters that the man here produced as John Watson was not the person known in La Grange as Joseph L. Ross; that he in no wise tallies

with the description of that individual in the letter; that he states positively that he is not the man referred to as Ross, although he says people around the building called him by that name, but that he was never known by any other name than Watson.

Joseph L. Ross and John Watson were two different persons, it is true; but it is also true that during the six years prior to 1899 that the latter was in La Grange he was sometimes called and known as Ross by persons with whom he was familiar, and that he received letters so addressed which he says he always turned over to Mrs. Ross, the widow with whom he lived. Watson swears that all around the building where he was working they used always to call him Ross, which was not his true name, nor did he assume it, but he allowed the neighbors and the others to apply it to him. Watson had known Joseph L. Ross about eighteen years ago, but he had never seen him in La Grange, nor had ever heard of him there, and Ross never was in that town during his time, so far as he had ever heard or seen; the widow Ross had never been married to Joseph, and Watson testified that he certainly would have known that fact if it were true. La Grange was a place of nine or ten thousand inhabitants. Watson knew that Joseph L. Ross did not leave La Grange and go to live on Adams near Halsted street, Chicago, because he lived there himself in the same house with the widow Ross. While he was not married to her his association was intimate, but his family and home were in San Francisco, to which place he returned about twelve or fourteen months prior to this trial.

The testimony of Watson is in the main substantiated by the stories collected and collated by the Pinkerton corps of detectives, who supply and clarify what is deficient or obscure in the narrative of this witness. While, as counsel for respondents declares, this man does not freely and fully expose his relations with the Rosses in La Grange, and denies that he ever posed as Joseph, yet it does appear from the report of Pinkerton's operatives that when John Watson went to La Grange in 1893 and found William Ross dead, with whom he had been acquainted, both having been lathers by trade, he lived for a time with the widow, but was not married

to her, as he had a wife and grown daughter in San Francisco, to whom he subsequently returned. The chief of police knew Watson from the time the latter came to La Grange in the early part of 1893, about the time of the opening of the World's Fair, and the chief states that Watson was known to everyone as Joe L. Ross, a brother of the late William Ross, who had died the previous year, but he generally introduced himself as Watson and so signed his letters. Watson was living very intimately with the widow Ross, but they were not married. The former postmaster stated that during his term Joe L. Ross had a box for his letters, which were addressed sometimes to that name, and other times Joe L. Watson, but always claimed by the same man when called for. It is clear from the statements made by the various persons named in the Pinkerton letters, and the circumstances in which they were produced and compiled, that the facts are not fabricated, and they all conspire to one irresistible conclusion: That the genuine Joseph L. Ross did not live at any time in La Grange, but that John Watson, the witness examined here, was the individual to whom that appellation was applied in the small town where he spent the period of six years or more, and where for purposes of his own he did not undertake to deny that he was the brother in law of the widow with whom he was maintaining meretricious relations while he had a wife and family in the city of San Francisco. Watson is the man who was mistaken for Joseph L. Ross, and the circumstances of his allowing himself to be so called and known to the townspeople, tradesmen, shopkeepers, artisans, contractors by whom he was employed, companions generally, and police officers particularly, and his cohabitation with the widow Ross, were the source of the false rumors that found their way across the continent and reached the ears of the family in San Francisco, and led them to believe that the relative who disappeared in Spokane in 1889 had come to life again several years thereafter in La Grange, Illinois, although they were not so far credent of the tale as to give it the dignity of affirmation until after the appearance of the minor as a claimant subsequent to the decree which vested in them virtually the whole estate.

It seems to this court that, so far as the presumption of the death of Joseph L. Ross is concerned, claimant has established that proposition, but counsel for respondent exclaims, assuming that petitioner has prevailed on this point, it avails her naught.

Counsel for respondents contend that even if it be established that testator made a mistake in regard to the continued existence of his son, Joseph L. Ross, that it is immaterial so far as the estate is concerned, because that statute, section 1307, was satisfied when he made provision for the said son; if testator was erroneously informed and mistakenly believed that Joseph L. was still living at the date of making the will, the case of claimant is not aided by testator's error of information and belief, because if, according to the argument, testator believes a child to be living, he cannot be said to have forgotten the issue of that child, for under the statute, section 1307, he is not bound to provide for or remember a grandchild if its parent be provided for. A grandchild is to be provided for only in the event that there be no provision for its parent, and the statute is satisfied if there be such provision.

Sections 1306 and 1307 may be read together:

"1306. Whenever a testator has a child born after the making of his will, either in his lifetime or after his death, and dies leaving such child unprovided for by any settlement, and neither provided for nor in any way mentioned in his will, the child succeeds to the same portion of the testator's real and personal property that he would have succeeded to if the testator had died intestate.

"1307. When any testator omits to provide in his will for any of his children, or for the issue of any deceased child, unless it appears that such omission was intentional, such child, or the issue of such child, must have the same share in the estate of the testator as if he had died intestate, and succeeds thereto as provided in the preceding section."

It has been held in California that the purpose of the statute is not to compel actual provision for heirs, but simply to require that the testator should have them in mind. When they are present to the mind of the testator, the statute affords no protection if provision is not made for them. It

has been uniformly held that the statute applies only to a case where a child or descendant is forgotten or unknown, or for some reason unintentionally overlooked. The object of the statute is to protect the children from omission or oversight unintentional, but when they are present in the mind of the testator, the statute affords no protection if provision be not made for them. In the case of Callaghan cited by counsel the children were expressly named in the will, and there was no doubt they were intended, but the bequest or devise failed because the property had been transferred by testatrix and was not owned by her at the time of her death. That is not the case at bar. But counsel for respondents contend that a grandchild is to be provided for only in the event that there be no provision for its parent, and that the court will not review the correctness of the conclusion of testator upon the existence of his son Joseph L. Ross, and nothing in the will negatives testator's belief in the continued existence of his child, and the legacy of $10 is a clear indication of testator's belief, which must be taken as proved, for the law presumes that he is correct in his conclusions and has made no mistakes, and the court will not concern itself as to his correctness. Assuming, however, that Joseph L. was dead at the time of execution of the will, counsel for respondents insist that the legacy does not lapse, but descends to his daughter Ethel, and, therefore, the will containing a provision for the issue of deceased child fully satisfies section 1307 of the Civil Code, and precludes her from claiming as pretermitted, and, consequently, she has no legal status here in any event, for under the dominant statute, section 1310, Civil Code, the legacy does not lapse, but goes to her as the issue of her deceased father, the son of testator.

"Section 1310. When any estate is devised to any child, or other relation of the testator, and the devisee dies before the testator, leaving lineal descendants, such descendants take the estate so given by the will, in the same manner as the devisee would have done had he survived the testator."

The application of this section to the case at bar raises a question new in this state, but I do not think the construction of counsel for respondents will be countenanced by the appellate tribunal upon a review of this record. A case from

Missouri, where the statute seems to be similar to our code, sections 1307 and 1310, is cited as an exact photograph of the one we are dealing with here, but after a careful reading I do not consider that it chimes in with all the facts and circumstances of this claimant's case, and, as said by our supreme court in the matter of Stevens, on questions of construction, one case, unless in all respects similar to this, cannot be regarded as an authority. In the opinion of this court, the acceptance of the Missouri case as an authority here would be repugnant to the reason of our code section upon which she depends, and destructive of a right guaranteed as a presumptive heir of the testator.

I am unable to conceive how section 1310 can be applied rationally to substitute as the recipient of the legacy to Joseph L. his child Ethel, who was not therein suggested as substitute or successor in any event. That section was designed to benefit a class of lineal descendants who were not presumptive heirs at the date of the will, but who, by reason of the contingency occurring between that time and the death of the testator, became entitled to the devise or bequest made to their ancestor; but section 1307 of the Civil Code describes a separate class, in which is found this claimant, and was passed for the protection of presumptive heirs, in which guise she presents herself to this court, and not as *one* within the contemplation of section 1310.

At the date of the will Ethel's father was dead; the bequest to him was vain. It is immaterial whether the testator was mistaken as to his son's existence; it is only material that the junior Joseph was incapable of inheriting through a natural cause; that he left a child, who was presumptive heir to the testator, but who was not mentioned or alluded to in the testament, and who is entitled to the share she could have claimed at the date of that document had the senior Joseph died intestate.

This conclusion is in concord with all the California cases cited.

Prayer of Ethel granted.

The Estate of Joseph Ross was Before the Supreme Court of California in 140 Cal. 282, 73 Pac. 976.